Filed 4/30/13  Ross v. Stranger CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ELIZABETH B. ROSS,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GREGORY A. STRANGER,<br><br>        Defendant and Appellant. | A130071<br><br>(Marin County<br>Super. Ct. No. CV 083069) |

## I.  INTRODUCTION

This case pertains to disputes between Gregory Stranger and Elizabeth Ross regarding their partnership in a commercial real estate defeasance business.[1]  A jury determined that Stranger is liable to Ross for breach of contract, breach of fiduciary duty and fraud.  Ross was awarded $969,849.73 in compensatory damages and $1.5 million in punitive damages.

On appeal, Stranger contends (1) the trial court committed prejudicial error by admitting evidence that he was convicted of a crime in 1995; (2) he is not personally liable to Ross on any of her contract claims; (3) there was insufficient evidence of a

---

[1]  A defeasance is "generally defined as a clause in a deed, lease, or other written instrument the legal effect of which is to defeat, cancel, or annul the instrument in whole or in part and thus wholly or partly to release the parties from obligations arising under it upon the happening or not happening of a condition subsequent." (Ballentine's Law Dictionary (3rd ed. 2010).)  In a commercial real estate defeasance transaction, the holder of a loan on commercial real estate substitutes a portfolio of bonds as collateral for the loan and then uses cash flow from the portfolio to pay down the mortgage.

1

fiduciary relationship between him and Ross; and (4) the punitive damages award is excessive as a matter of law. We reject these contentions and affirm the judgment.

## II. STATEMENT OF FACTS

### A. *The Parties*

Gregory Stranger has a B.A. in economics from the University of Chicago and a master's degree from the Kellogg Graduate School of Management at Northwestern University. His employment background is in financial services and investment banking. In early 2006, Stranger was employed at the Boston Consulting Group when he decided to start a defeasance business. That spring or summer, Stranger formed two companies to operate the business: (1) Capital Defeasance Group, LLC (CDG), a consulting service for defeasance customers; and (2) Successor Borrower Services, LLC (SBS), the function of which was to form successor borrowers related to defeasance transactions. Both CDG and SBS were owned by SierraCrest Financial, the sole member of which was the Stranger Family 2003 Trust.

In 2006, Elizabeth Ross and her family were friends and neighbors with Stranger and his family. Ross has a B.A. in economics and a master's degree in business administration from Yale. Her employment background is in the commercial real estate business.

### B. *The Business Venture*

In March 2006, Stranger approached Ross as a source of potential defeasance clients because of her background in commercial real estate. After discussing the project with Ross, Stranger asked her to become his partner. Ross, who was on maternity leave at the time, was interested in the opportunity, but she wanted to learn more about the defeasance industry and she was not ready to return to a full-time job. She offered to work for the business part-time without compensation for the summer and then let Stranger know if she would become his partner.

At the beginning of the summer of 2006, Stranger told Ross that, if she joined the company full-time, the two of them would be "equal partners." Stranger said he would cover the start-up costs because they were not going to be substantial, and he was going

2

to go ahead with the business whether with Ross or with some other partner. Stranger promised that if Ross did decide to stay, the two of them would split the profits 50/50. Stranger confirmed these representations after Ross started working for the business, during a July 6, 2006, dinner party at Ross' home.

In September 2006, Ross told Stranger that she had decided to accept his offer and join the company full-time. A few days later, Stranger complained that Ross did not deserve half the company because he had put up all the money and worked full-time over the summer while Ross only worked part-time. Ross responded that she had entered the relationship with the understanding they would be equal partners and that was the only basis under which she was willing to work with him. Stranger indicated that his objection was not sharing ownership or operating power but that he was concerned about how the cash generated by the business would be distributed. Ross said that if Stranger wanted a return on his up front investment, they could structure a deal which gave him more cash up front, but that she wanted to get to a point where they would share equally in the cash.

On September 12, 2006, Ross sent Stranger an e-mail and attachment outlining a proposed partnership structure which would give Stranger a higher percentage of initial cash distributions to compensate him for his preliminary work and initial funding outlay. Stranger sent a reply that it probably was "not best" to discuss the matter via e-mail. A few weeks later, on or around October 6, 2006, Ross and Stranger reached an agreement that they would (1) be 50/50 partners in the business; (2) have equal operating power; and (3) share the profits based on a structured payout.

The terms of the structured payout were summarized in a document dated October 6, 2006, which was titled "SierraCrest Financial, LLC Member financial agreement" (The October 2006 Agreement). The October 2006 Agreement consists primarily of a spreadsheet reflecting that the first $1,625,000 of profits would be split 70 percent to Stranger, 30 percent to Ross, the next $3,250,000 would be split 60 percent to Stranger and 40 percent to Ross, and any profits beyond that would be split 50/50 between Stranger and Ross. The October 2006 Agreement also contains cryptic notes including

3

that "GS to invest $100,000 equity." Both Stranger and Ross signed their names to this agreement. Stranger said he would contact CDG's outside counsel, Chris Henrich, to draft an ownership agreement for them.

In the fall of 2006, Stranger was sued for stealing trade secrets by Commercial Defeasance Group, a client of his former employer. Subsequently, CDG was named as a defendant in that case and counsel was retained to represent both the company and Stranger individually. Legal fees for this litigation were paid by CDG.

Meanwhile, Stranger and Ross continued to develop their business. They both signed and personally guaranteed a lease for office space in Novato. They also worked together to generate biographies and other marketing materials which stated that Stranger and Ross were co-founders and principals of CDG. Stranger also told potential customers that Ross was his partner. In late October 2006, Stranger and Ross closed their first transaction with Matteson Realty, a client that was retained through a business contact Ross supplied and that went on to complete a total of five transactions with Stranger and Ross.

On January 5, 2007, Chris Henrich, CDG's outside counsel, sent an e-mail to Stranger and Ross. Henrich stated that Stranger had "sketched out" their "understanding" for him, and that he wanted to outline the relevant issues and pose some thoughts and questions. The first issue Henrich addressed was the "unwinding of ownership" of CDG and SBS. Henrich stated that the plan was to eliminate the holding company structure whereby "at least on paper" SierraCrest owned all of the equity in CDG and SBS, and to transfer those interests to Ross and Stranger. He also advised that they could make the equity transfer to Ross without creating a tax event by backdating the new operating agreements for CDG and SBS. Henrich addressed other issues pertaining to the new ownership structure and operating agreements and raised questions for further discussion.

Around this same time, the legal fees for the trade secret litigation had become so large that CDG did not have funds to cover them. Stranger asked Ross if she would loan the company money to pay the fees. Ross declined this request; knowing a new defeasance business would not generate profits for a few years, she was concerned about

4

repayment. Instead, Ross offered to make an equity investment in the company which would match Stranger's prior equity contribution. Stranger resisted that offer, although he would not say why, and continued to press Ross for a loan.

In early March 2007, Stranger gave Ross a draft operating agreement which was titled "LIMITED LIABILITY COMPANY AGREEMENT OF ____," and was dated "as of _____, 2006." The form agreement was incomplete and had not been individualized to a specific company. However, it did incorporate a "SCHEDULE A" and an "EXHIBIT A," reflecting that Stranger and Ross owned equal shares in, and were the two "Managing Members" of the Company. Ross testified at trial that Stranger gave her this draft agreement to assure her that she was an equal partner in the business so that she would agree to make a loan to cover the trade secret litigation fees. However, Ross would not loan the company any money, telling Stranger that she was concerned the company would not survive because CDG could not pay the legal fees. A few days later, Stranger agreed that Ross could make a $100,000 investment, that the two would remain equal owners, and that they would split the profits equally between them. Again, Stranger said he would work with Henrich to get the agreements finalized.

The next several months were a very busy period for the business; both partners were traveling and closing many deals. Several of those defeasance transactions required an Indemnity and Guaranty Agreement from the successor borrower established by SBS. Pursuant to these agreements, Stranger and Ross both acted as personal guarantors for the successor borrower. In August 2007, Ross made the $100,000 equity investment in the business by writing a check to SBS. The following month, Ross followed up with Henrich about issues he raised in his January 2007 e-mail. A few days later, on September 18, 2007, new operating agreements and transfer of ownership documents dated as of September 2006 were finalized and ready to sign.

On November 5, 2007, after four or five unsuccessful attempts to get Stranger to finalize the ownership documents, Ross sent Stranger an e-mail in which she emphasized that getting the agreements signed was a priority for her and asked again that Stranger make time to go through the drafts that Henrich had provided. After Stranger responded

5

that he had other priorities, Ross sent another e-mail on November 6, which stated, in part: "I have worked for almost 18 months without pay. In addition, I wrote a check for $100,000 over 2 months ago on good faith that we would get our agreement showing that I own 50 percent of both companies down in writing shortly thereafter."

When Ross arrived at her office on the morning of November 7, she found a check for $100,000 on her office chair. She went to ask Stranger about it and he said that she seemed concerned about her money so he was returning it to her, but that was all she was going to get. Ross returned the check, telling Stranger that this was not their deal, that she had not been paid for 18 months, and that she wanted to adhere to their agreement. A day or two later, Stranger told Ross that he was not going to honor their agreement and that he was not sure what she planned to do about it. The two agreed to seek assistance from Henrich. Each spoke separately with him, but when Ross attempted to have them all sit down together, Stranger put her off again.

On December 12, 2007, Ross finally left the company. She was not reimbursed for her outstanding work expenses. Furthermore, Stranger did not respond to overtures from Ross's husband to attempt to resolve the dispute, although he did offer to purchase Ross's interest in the defeasance business for $1.

## C.  *The Present Action*

In June 2008, Ross filed this action against Stranger, Stranger's wife, The Stranger Family Trust, CDG and SBS. Stranger's wife and The Stranger Family Trust were dismissed from the action without prejudice prior to trial. At some time not disclosed in the record, CDG filed for Chapter 7 bankruptcy and, as best we can determine, never participated in this case. Although SBS filed for Chapter 11 bankruptcy, Ross obtained relief from the automatic bankruptcy stay and settled her claims with the Chapter 11 trustee.

In her initial complaint, Ross alleged causes of action against Stranger for breach of contract, declaratory and injunctive relief, unjust enrichment, breach of the covenant of good faith and fair dealing, intentional and negligent misrepresentation, breach of fiduciary duty, conversion, and securities law violations.

6

**D.**     *Stranger's 1995 Criminal Conviction*

After she filed this action, Ross discovered that, in November 1995, Stranger pled guilty to the crime of creating a false market while he was living and working in England. After she discovered this prior conviction, Ross filed a fifth amended complaint, the operative pleading, which added a cause of action for fraudulent nondisclosure.

At trial, Stranger admitted his prior conviction and also stipulated to the admission of a document pursuant to which an officer of the Crown Court of England "certified" that, on November 10, 1995, Stranger was "upon his own confession convicted upon indictment of CREATING A FALSE OR MISLEADING IMPRESSION AS TO THE MARKET IN, OR VALUE OF, AN INVESTMENT WITH THE PURPOSE OF CREATING THAT IMPRESSION," that he was sentenced to one year imprisonment, and that he was ordered to pay 20,000 pounds toward prosecution costs within three months time.

When asked at trial about the circumstances that led him to plead guilty, Stranger claimed he did not understand the question. After prompting from the trial judge, Stranger offered this testimony: "Oh, the—what was alleged was that I—as a market maker you make prices in—these were warrants that I had made a price that was incorrect; price that was too high, or a price that was too low; didn't reflect the value. So we were buyers and the sellers in this marketplace for the bank, and the—what I plead guilty to was creating a false or misleading impression as to the market in one of these securities." Stranger denied any "personal gain" from the transaction that led to his conviction. When asked whether he signed a consent decree, Stranger responded that "[t]hat was not part of my conviction," and testified that he did not have an understanding as to what a consent order is. Stranger also testified that he appealed the monetary fine but he left the country before his appeal was decided and he thus never paid the fine.[2]

---

[2] The trial court excluded evidence of the content of the British Crown Court decision denying Stranger's appeal of the fine imposed on him in connection with this conviction. That appellate decision contains a factual summary which reflects, among other things, that (1) Stranger's illegal trading activity garnered him a personal profit of

Stranger never disclosed his prior conviction to Ross during the time they worked together. Rather, Stranger told Ross that he stopped working as a trader in London because friends told him that the job made him arrogant and so he decided to change careers. After she filed this lawsuit, Ross learned that the real reason that Stranger stopped working as a trader was because he went to jail. Ross testified that, had she known about the conviction, she never would have left her prior employment or gone into business with Stranger. Nor would she have invested $100,000 in the business, signed a lease with Stranger, or entered into the indemnity agreements that she and Stranger signed on behalf of the company.

Kathryn O'Neal, who worked for several years in the commercial real estate department of Wells Fargo Bank, testified at trial as an expert in the area of defeasance transactions and banking standards relating to defeasance transactions. O'Neal testified that, based on her review of the evidence, Stranger had not disclosed his conviction to servicers who conducted business with CDG and SBS and, had that conviction been disclosed, those service providers would not have done business with these companies. Jack Blumenthal, plaintiff's expert in the field of certified public accounting and standards governing certification of defeasance transactions, testified that no accounting firm that provides the certification services that are required to close a defeasance transaction would have accepted CDG as a client had it known of Stranger's prior conviction.

**E.      *The Judgment Against Stranger***

In August 2010, the legal claims against Stranger were resolved by a jury. On August 20, the jury returned a general verdict holding Stranger liable to Ross for breach of contract, breach of the covenant of good faith and fair dealing, fraudulent misrepresentation, fraudulent failure to disclose and breach of fiduciary duty. Ross was

---

3,821,000 Swiss francs or 1.9 million pounds; (2) an injunction was issued to freeze this money, which Stranger had transferred into his Swiss bank account; and (3) Stranger signed a consent order pursuant to which he returned all of the money he made by this illegal trading activity.

awarded $969,849.73 in damages and an additional $1.5 million in punitive damages.  A subsequent court trial, conducted in October 2010, resulted in a judgment for Ross on her equitable claims against Stranger.

### III.  DISCUSSION

**A.**  ***The Prior Conviction Evidence***

Stranger contends that the trial court committed reversible error by admitting evidence of his 1995 conviction.  "Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion."  (*Pannu v. Land Rover North America, Inc*. (2011) 191 Cal.App.4th 1298, 1317.)  As we will explain, the trial court did not abuse its discretion by admitting evidence of the 1995 conviction because that evidence was admissible for two independent reasons:  (1) to prove fraud; and (2) to impeach Stranger's credibility as a witness.

**1.**  ***Fraud***

As reflected in our factual summary, Ross's fraudulent concealment claim was tried to the jury.  " '[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.' [Citation.]"  (*Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 748.)

The trial evidence regarding Stranger's 1995 conviction was directly relevant to prove these elements of Ross's nondisclosure fraud claim, which was based on allegations that Stranger had a duty to disclose his prior conviction to Ross because it was material to their joint business venture, that Ross would not have gone into business with Stranger had she known about the conviction, and that she suffered damage as a result of Stranger's concealment of his criminal past.

9

On appeal, Stranger does not actually dispute that the prior conviction evidence was relevant to the fraudulent non-disclosure claim.[3] Instead, he attempts to skirt the issue entirely by arguing that the trial court admitted evidence of his prior conviction solely for the limited purpose of impeaching his credibility. However, Stranger does not identify any trial court order to that effect.

Furthermore, the record clearly shows that the trial court did admit evidence regarding this prior conviction for purposes other than impeachment. Evidence Code section 788 (section 788) provides that "[f]or the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of judgment that he has been convicted of a felony . . . ." Here, the evidence regarding Stranger's conviction was not limited to an examination of the witness and a record of the judgment, but also included percipient and expert testimony supporting the plaintiff's fraud claim. Indeed, the trial court overruled an objection to the expert testimony by Mr. Blumenthal on the following ground: "In this lawsuit one of the causes of action, I believe, is for fraud and the issue of whether Mr. Stranger willfully concealed a criminal conviction is an element of that, and it certainly would have affected the entire business, including Ms. Ross' participation in it. . . ."

Ignoring the evidence itself, Stranger contends that his prior conviction was admitted for a limited purpose because the jury received this instruction: "You have heard that the defendant in this trial has been convicted of a crime. You were told about the conviction only to help you decide whether you should believe the defendant. You must not consider it for any other purpose." However, this jury instruction is not the equivalent of or a substitute for an evidentiary ruling. In other words, the propriety of this jury instruction presents a fundamentally different inquiry for a court of review.

Indeed, because the prior conviction evidence *was* relevant to the fraud claim, the error Stranger seeks to exploit in this appeal is in the instruction itself and not in the

---

[3] At oral argument before this court, Stranger's appellate counsel expressly conceded that the prior conviction evidence was relevant to Ross's fraud claims.

admission of evidence. This instruction is a version of CACI No. 211, the model Judicial Council of California Civil Jury Instruction regarding the use of a prior felony conviction to impeach the credibility of a witness. The use note for this instruction states that the court should "include the word 'only' unless the court has admitted the evidence for some other purpose," in which case the court should omit that word, delete the last sentence of the instruction, and specify the other purpose for which the evidence is admitted. The record does not explain how or why the trial court failed to make these appropriate modifications. Regardless, the error does not constitute a ground for reversal in this case because it did not prejudice Ross,[4] and it could only have benefited Stranger by improperly limiting the jury's consideration the prior conviction evidence.

### 2. *Impeachment*

Stranger contends that, even if the conviction evidence was admissible to prove fraud, the trial court committed reversible error by allowing the evidence to be used for the additional purpose of impeaching his credibility.

As noted above, section 788 provides that the credibility of a witness in a civil action may be impeached with evidence that he suffered a prior felony conviction. Here, Stranger contends that his 1995 British conviction is not the equivalent of a California felony.

### a. *Background*

William Locke, an attorney who has practiced criminal law in California and England, was retained by Ross to provide an expert opinion regarding the nature of Stranger's British conviction. Prior to trial, Locke gave a deposition in which he testified, among other things, that "the offense of which Mr. Stranger was convicted is the equivalent of a felony under California law."

In formulating his opinion, Locke reviewed documentary evidence regarding Stranger's prior conviction which showed, among other things, that Stranger was

---

[4] During closing argument, both parties discussed whether the evidence pertaining to the prior conviction was sufficient to support the nondisclosure claim, and, in the end, the jury entered a verdict in favor of Ross on that claim.

11

convicted pursuant to an indictment of creating a false or misleading market, and that he was sentenced to a year imprisonment. In his deposition, Locke testified that the crime Stranger committed was a provision of The Financial Services Act of 1986 (the Act).[5] Locke opined that Stranger's violation of the Act was the equivalent of a felony under California law, which defines a felony as an offense for which a state prison sentence can be imposed.

According to Locke, "the differentiation between indictable and summary offenses in England is effectively the same distinction as we make between misdemeanors and felonies in California." Locke's research showed that, prior to 1967, British law used the terms "felony" and "misdemeanor" to "differentiate major and minor offenses." However, after 1967 those terms were abandoned and, under current law, more serious offenses are called "indictable offenses" and less serious crimes are called "summary offenses." Locke also noted, among other things, that a summary offense is tried in a magistrate's court by a lay person and the maximum sentence for such an offense is six months. "An indictable offense, on the other hand, goes to a Crown Court judge and can draw a sentence as designated by statute. [¶] In the indictable offenses, an accused person is provided an opportunity and a right to have their case tried by a jury."

Prior to trial, Stranger filed an in-limine motion to exclude Locke's testimony on the ground that the documentary evidence that he suffered a British conviction in 1995 was inadmissible hearsay. The trial court denied that motion of the following ground: "Defendant's objection to the evidence of the prior conviction is overruled. The

---

[5] This court granted Stranger's request to take judicial notice of the relevant provisions of the Act. Section 47(2) of the Act states: "Any person who does any act or engages in any course of conduct which creates a false or misleading impression as to the market in or the price or value of any investments is guilty of an offense if he does so for the purpose of creating that impression and of thereby inducing another person to acquire, dispose of, subscribe for or underwrite those investments or to refrain from doing so or to exercise, or refrain from exercising, any rights conferred by those investments."

Defendant admitted his conviction in sworn testimony.[6]  It appears Mr. Locke has the credentials necessary to establish the fact of the Defendant's British felony conviction. We all know under Evidence Code 788, evidence of a prior felony conviction whether or not it involved moral turpitude can be used to impeach a defendant or any witness's credibility."

Throughout trial, Stranger vigorously opposed the admission of any evidence pertaining to his 1995 conviction, and he made at least two additional motions to exclude Locke's testimony.  Ultimately, near the end of the trial, the court granted a motion by Stranger to exclude Locke's testimony pursuant to Evidence Code section 352.  Ross objected that Locke's testimony was relevant and admissible to establish that Stranger's prior conviction was equivalent to a felony under California law.  However, the trial court agreed with Stranger that Locke's testimony was cumulative and irrelevant since the jury had already heard evidence which proved that Stranger had suffered the prior conviction. The court also opined that since the previously admitted evidence proved the prior conviction was for a crime of moral turpitude, the question whether the conviction was for a felony or a misdemeanor was no longer material and that Locke's testimony was more prejudicial than probative.

### b.    *Analysis*

The appellate record contains substantial evidence that Stranger's prior conviction is the equivalent of a California felony.  Evidence admitted at trial shows that Stranger was convicted upon an indictment of making a false market and that he was sentenced to a year imprisonment for his crime.  Under California law, "[a] felony is a crime that is punishable . . . by imprisonment in the state prison." (Pen. Code, § 17, subd. (a).)  The trial evidence also shows that Stranger created a false market in a security by engaging in

---

6  The sworn testimony was given during a hearing in the SBS bankruptcy case. At that hearing, Stranger testified that he was accused of "making a mistake in the price of a market of a security" while working in London as a trader for a bank.  Stranger admitted he was criminally prosecuted in the United Kingdom in 1994, and that he pleaded guilty to a crime, but testified that he did not know what crime he plead guilty to, or if he was actually convicted.

13

illegal trading activity.  As Stranger expressly concedes on appeal, under California law, trading activity designed to create a false or misleading market can be prosecuted as a felony.  (See Corp. Code, §§ 25500, 25540.)  Finally, although Locke was not permitted to testify at trial, his deposition testimony was before the trial court when it ruled that the prior conviction evidence could be used for impeachment.  Locke's expert testimony established that an indictable offense under British law is the equivalent of a California felony.

On appeal, Stranger argues that the record does not support a finding that his prior conviction was the equivalent of a felony because Locke's expert opinion and supporting conclusions "were incorrect as a matter of law."  We reject this argument for several reasons.  First, even if we do not consider Locke's deposition testimony, the trial evidence referenced above supports a finding that Stranger's British conviction was the equivalent of a California felony.

Second, as reflected in our background summary above, Locke was precluded from testifying at trial about his opinions pursuant to Stranger's Evidence Code section 352 motion.  To the extent Stranger now contends that Locke's expert opinion was somehow lacking or deficient, trial testimony from Locke would not have been cumulative or irrelevant.  Furthermore, although potentially damaging to Stranger's credibility, that testimony would not have been unduly prejudicial.  In other words, Locke was erroneously precluded from fully articulating and explaining his expert opinion to the trial court.  "A party who has prevented proof of a fact by his erroneous objection will not be permitted to take advantage of his own wrong, and a reviewing court will assume that the fact was duly proved.  [Citation.]"  (*Watenpaugh v. State Teachers' Retirement System* (1959) 51 Cal.2d 675, 680; see also *Kessler v. Gray* (1978) 77 Cal.App.3d 284, 290.)  Here, Stranger cannot exploit the erroneous evidentiary ruling regarding Locke's testimony to create a ground for appeal.

Third, Stranger fails to identify any actual flaw in Locke's analysis.  Instead, he purports to articulate a "better approach" for determining whether a foreign crime can be used for impeachment.  Stranger proposes to ignore all evidence of what he actually did

14

and to limit the relevant inquiry to an analysis of "the *elements* of the offense of the foreign jurisdiction and determine whether, if committed here, said offense would qualify as a felony." Purporting to employ this better approach, Stranger attempts to show that the elements of the offense he committed are most analogous to Penal Code section 395 (section 395), which states: "Every person who willfully makes or publishes any false statement, spreads any false rumor, or employs any other false or fraudulent means or device, with intent to affect the market price of any property, is guilty of a misdemeanor."

Again, this theory is not properly raised on appeal. The doctrine of implied waiver applies to a claim of error based on a theory that was never asserted in the trial court. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2011) ¶¶ 8:229, 8:236, pp. 8-155, 8-157.) Here, Stranger consistently challenged the admissibility of evidence pertaining to his prior conviction. But, we find no permeation of that argument in which he even suggested that he could not be impeached with the prior conviction because it was the equivalent of a section 395 misdemeanor. Furthermore, Stranger has provided us with no case authority or sound reasoning as to why his self-serving analysis is better than the expert opinion and conclusions that Locke provided to the trial court in this case. That expert testimony and other evidence before the trial court supports the conclusion that Stranger's 1995 conviction qualifies as a felony under California law.

Stranger also makes the separate claim that the trial court committed reversible error by allowing the prior conviction to be used as impeachment evidence pursuant to section 788 notwithstanding the fact that the court expressly refused to find that the 1995 conviction was actually a felony. As our background summary reflects, it does appear that, after considering this issue several times, the trial court expressed the opinion that it did not matter whether Stranger's prior conviction was a felony because it was clearly a crime of moral turpitude. Even if this comment could be construed as an actual ruling, it only benefited Stranger because it led the trial court to preclude trial witnesses and trial counsel from explicitly characterizing Stranger's prior conviction as a felony.

15

**B.**     *Stranger's Contract Liability*

Stranger contends that, as a matter of law, he is not personally liable for breach of contract or breach of the implied covenant of good faith and fair dealing because he was not a party to any partnership contract with Ross.  We disagree.

By its general verdict, the jury made an implicit finding that Stranger did personally enter into a contract with Ross.  The evidence summarized in our factual summary substantially supports the jury's finding.  That evidence shows, among other things, that in the beginning of the summer of 2006, Stranger offered to make Ross a 50/50 partner in his defeasance business if Ross worked part time without pay over the summer and then agreed to take on the responsibilities of a full-time partner.  Ross worked part-time over the summer, accepted the offer of a 50/50 partnership in the defeasance business, and worked with Stranger as his partner to develop their business through the operation of two companies, CDG and SBS.

There is also evidence that one term of the oral partnership contract between these individuals was modified twice.  In October 2006, Ross and Stranger agreed to a different structure for sharing profits.  That modification was memorialized in a writing which Ross and Stranger signed as individuals.  In March 2007, the oral partnership contract was modified a second time when Stranger agreed to split profits equally in exchange for Ross's equity investment of $100,000.  This second modification was reflected in a draft operating agreement dated March 1, 2007, which was prepared by CDG's outside counsel, Chris Henrich.  Though never executed, this draft agreement identifies the contracting parties as "Greg Stranger ('Stranger'), Elizabeth __ Ross ('Ross'), and other persons (if any) listed on Schedule A hereto (collectively, the 'Members')."  Attachments to this draft agreement include a Schedule A, which identifies Stranger and Ross as equal owners, and an Exhibit A which identifies them as the two management members of the company.

Stranger's theories as to why the trial evidence does not establish his personal contract liability are confusing to say the least.  As best we can determine, he makes two primary claims.  First, Stranger contends that the trial court violated the parol evidence

rule by admitting extrinsic evidence which is inconsistent with the terms of the October 2006 agreement. " 'Under the parol evidence rule, extrinsic evidence is not admissible to contradict express terms in a written contract or to explain what the agreement was. [Citation.]' " (*Cerritos Valley Bank v. Stirling* (2000) 81 Cal.App.4th 1108, 1115-1116.) According to Stranger, the October 2006 agreement was the only contract Ross ever signed and it did not give her an ownership interest in the defeasance business.

In making this argument, Stranger simply ignores the evidence establishing that he and Ross entered into an oral partnership agreement. " ' "[W]hen the respective parties orally agree upon all the terms and conditions of a contract with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be thereafter prepared and signed does not alter the binding validity of the original contract." ' " (*Woodard v. Schwartz* (1960) 181 Cal.App.2d 360, 363.) Furthermore, in such a case, the question whether the parties "intended their oral agreement to be immediately effective or only to become binding on the execution of the writing, is ordinarily a question of fact to be resolved by the trial court or jury in the light of all the surrounding circumstances." (*McKeon v. Giusto* (1955) 44 Cal.2d 152, 158.)

Stranger's second theory is that undisputed evidence establishes that, if there was a partnership agreement, that contract was between Ross and The Stranger Family Trust and, as a matter of law, he is not personally liable for a breach of contract committed by the Trust. According to Stranger, the *only evidence* regarding the identity of the parties to the partnership agreement was the draft operating agreement which, although never signed, "clearly identified" the owners and members of CDG and SBS as Ross and The Stranger Family Trust. Thus, Stranger concludes "[u]nder the operating agreements Greg Stranger, personally, would not have been a party to any agreement with Ross and had no legal obligation to perform under the terms of documents which Ross contended described her contractual relationship with him."

First, the draft operating agreement is obviously not the only evidence of the oral partnership contract between these two individuals. Second, Stranger fails to acknowledge that the version of the draft operating agreement that identifies the Trust as

17

a member/owner was prepared by Henrich in September 2007, after the partnership agreement between Stranger and Ross was made and modified for the last time. Third, Stranger conveniently ignores the fact that a different version of the draft operating agreement, the one he gave to Ross in March 2007 before she made her equity contribution to the business, named Stranger and Ross individually as the co-owners and co-members of the companies.[7]

In any event, all versions of the draft operating agreements are just drafts. They are not contracts and they simply do not establish the identity of the contracting parties as a matter of law. Nor do they undermine the substantial evidence supporting the jury's implicit finding that Ross and Stranger entered into an oral partnership agreement.

## C. *Breach of Fiduciary Duty and Concealment*

Stranger contends that the trial evidence was insufficient to establish that he and Ross were in a fiduciary relationship and, absent such evidence, the judgment against him for both breach of fiduciary duty and fraudulent concealment must be reversed.

A fiduciary relationship is " ' "any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. . . ." ' [Citations.]" (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29.) "Traditional examples of fiduciary relationships in the commercial context include trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventurers, and agent/principal. [Citations.]" (*Id.* at p. 30.)

---

[7] We note for the record that a copy of the March 2007 draft operating agreement, which was introduced into evidence at trial, was supplied to us in the Respondent's Appendix. Stranger failed to include this document in his Appellant's Appendix for the stated reason that "Appellant's counsel could not locate a copy" of it.

18

Here, there is substantial evidence of a fiduciary relationship between Ross and Stranger which arose pursuant to their relationship as business partners in the defeasance business. That evidence shows that Ross placed her trust and confidence in Stranger by becoming his business partner and investing her time and money in their joint business venture. That evidence also shows that Stranger voluntarily accepted and assumed that confidence by accepting Ross's work and money, holding her out as his partner and co-founder, and taking full advantage of his partnership with her to develop and grow their joint enterprise.

On appeal, Stranger contends that he could not have been in a fiduciary relationship with Ross even if she did acquire some ownership interest in the defeasance business because he was not personally a member of CDG and SBS. Stranger provides no authority supporting this theory and, as a purely factual matter, this argument is patently unconvincing. The fact that Stranger did not name himself as a member of the operating companies is hardly dispositive of the question whether he and Ross were business partners or members of a joint venture.

**D.** *Punitive Damages*

Stranger contends that the punitive damages award of $1.5 million is excessive as a matter of law. " 'Whether punitive damages should be awarded and the amount of such an award are issues for the jury and for the trial court on a new trial motion. All presumptions favor the correctness of the verdict and judgment. [Citation.]' [Citation.] ' "Juries . . . have a wide discretion in determining what is proper. [Citation.]" [Citation.]' [Citation.]" (*Bankhead v. ArvinMeritor, Inc*. (2012) 205 Cal.App.4th 68, 78 (*Bankhead*).) Accordingly, on appeal, we do not reweigh the credibility of witnesses or resolve conflicts in the evidence. (*Id.* at p. 77.) And, we will not " 'reverse the jury's determination unless the award as a matter of law is excessive or appears so grossly disproportionate to the relevant factors that it raises a presumption it was the result of passion or prejudice. [Citations.]' [Citation.]" (*Ibid.*)

19

### 1. *Issue Presented*

"Under California law, a punitive damages award must be based on three factors: (1) the reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded to or actual harm suffered by the plaintiff; and (3) the defendant's financial condition. [Citations.]" (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 690, fn. 18; see also *Adams v. Murakami* (1991) 54 Cal.3d 105, 110.) [8]

In the present case, Stranger focuses exclusively on the third factor, the wealth of the defendant. Stranger contends that the dearth of evidence regarding his personal financial condition raises a presumption that the punitive damages award was the product of passion or prejudice and establishes that the award is excessive as a matter of law.

The wealth of the defendant is an important consideration when determining whether a punitive damages award is excessive. The deterrent function of punitive damages " 'will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort'; conversely, 'the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter.' [Citation.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 620.) Accordingly, an award that is reasonable in light of the nature of the defendant's conduct and the degree of injury to the plaintiff may nevertheless be so disproportionate to the defendant's ability to pay that it is " 'excessive' for that reason alone." (*Bankhead, supra*, 205 Cal.App.4th at p. 78.)

### 2. *Background*

When the jury returned the liability verdicts in this case, it also found that Stranger acted with malice, oppression or fraud. A few days later, on August 23, 2010, the jury

---

[8] The federal due process clause places different "constraints on state court awards of punitive damages." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712-713; see also *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1201; *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 418.) However, Stranger does not allege a due process violation in this case.

heard additional evidence to assist it in determining the amount of punitive damages, if any, to assess against Stranger.

During this second phase of the jury trial, Ross introduced evidence of a "financial statement" of assets and liabilities that Stranger prepared and submitted to Wells Fargo Bank in March 2007.[9] The assets that Stranger disclosed included cash, non-taxable accounts, private investments, a fishing boat, ownership interests in CDG and SBS, and several real property assets. According to this March 2007 financial statement, the total value of Stranger's assets was $9,568,000, and his total net worth was $4,745, 383. At trial, Stranger testified to the accuracy of his March 2007 financial statement, although he claimed it did not reflect his current financial situation.

Ross also presented evidence that, in March 2008, Stranger opened an account with a company called Interactive Brokers, and that more than $900,000 was transferred from SBS accounts into the Interactive Brokers account. Stranger testified that the Interactive Brokers account was an SBS investment account and that he did not personally receive any money from that account. During his testimony, Stranger also denied having any offshore accounts, but he admitted that he previously maintained bank accounts in both Switzerland and England. Stranger also acknowledged that in 1993, the year before he engaged in illegal trading activity, his employer paid him more than $1.1 million in compensation, and that he did have a Swiss bank account at that time.

Stranger produced evidence of a second "financial statement" that he prepared a few days before he testified at the punitive damages phase of the trial. Stranger testified that this new financial statement reflected his current assets and net worth. According to that new document, Stranger's net worth at the time of trial was negative $3,389,000. To explain changes in his financial situation since 2007, Stranger testified, among other things, that the total value of his real property assets had fallen from approximately $8 million to $4,552,000, which he attributed to a downturn in the market for these

---

[9] Stranger has not included a copy of this trial exhibit in his Appellant's Appendix, once again claiming that his counsel cannot locate the document.

21

properties. Stranger also claimed that he had incurred additional significant personal liability for unpaid services rendered to CDG and SBS and for the unpaid credit card bills of these companies Stranger admitted that several of the figures that he used to calculate his current financial position were estimates, made by himself or by his wife, and that they were not supported by any third party "statement." Stranger also admitted that several of the items he listed as personal debts on his current summary were also reported as company debts in the SBS bankruptcy case.

### 3. *Analysis*

Preliminarily, Stranger contends that there is no evidence establishing his ability to pay the $1.5 million award. We disagree. The 2007 financial statement constitutes substantial evidence that Stranger's personal assets are worth more than $9 million and that his net worth is at least half of that amount. At trial, Stranger claimed that his assets had lost much of their value, that he had significantly more liabilities than he did in 2007, and that he had a negative net worth. However, the verdict necessarily demonstrates that the jury did not find Stranger to be a credible witness.

Stranger also argues that "even when the evidence is viewed in the light most favorable to [Ross], the punitive damages awarded were over 31% of Stranger's 2007, net worth, and therefore excessive as a matter of law." According to Stranger, "it is generally accepted" that an award that exceeds 10 percent of the defendant's net worth is excessive as a matter of law.

First, we question whether this theory is properly before us on appeal. As we discussed earlier, as a general rule "theories not raised in the trial court cannot be asserted for the first time on appeal." (Eisenberg, et al., Cal. Practice Guide, *supra*, ¶ 8:229, pp. 8-155 to 8-156.) In his motion for a new trial, Stranger argued that the punitive damages award was excessive because he could not afford to pay it. But Stranger did not argue that the award was improper because it exceeded 10 percent of his net worth.[10]

_____

[10] In his memorandum in support of the new trial motion, Stranger made the following argument: "defendant requests that [the] court find the $1,500,000 in punitive damages excessive, or that the evidence was in sufficient to support this verdict. The

22

Second, there is no rule in California that a punitive damages award that exceeds 10 percent of the defendant's net worth is excessive as a matter of law. (*Bankhead, supra,* 205 Cal.App.4th at p. 83.) To the contrary, relevant authority establishes that net worth is only one potential measure of a defendant's wealth and it can be potentially very misleading because it is subject to easy manipulation. (*Id.* at pp. 78-83, and authority discussed therein.) As our colleagues in Division Four of this court recently explained in *Bankhead*, *supra*, the issue on appeal is not whether the award exceeds some specified percentage of the defendant's net worth, but rather whether the trial court abused its discretion by finding that the amount of the jury's award was not the product of passion or prejudice. (*Id.* at p. 83.) "Our task is simply to determine whether, '[c]onsidering all the factors, the punitive damages award, "in light of the defendant's wealth and the gravity of the particular act," . . . exceed[s] "the level necessary to properly punish and deter." [Citation.]' [Citation.]" (*Ibid.*)

When considered in context, Stranger's 2007 financial statement, including his reported net worth at that time, was relevant, but it was not the only indicator of his financial condition. There was also evidence that: Stranger had personal access to profits generated by the defeasance business; since 2008, close to $1 million was transferred out of SBS accounts; and Stranger had a history of holding funds in bank accounts outside this country. From this and other evidence presented at trial, the jury could have concluded not only that Stranger's financial condition is stronger that reflected in his 2007 financial statement but also that Stranger intentionally obfuscated the evidence regarding his net worth and financial resources.

For all of these reasons, we conclude that the trial evidence regarding Stranger's financial condition does not compel the conclusion that the punitive damages award exceeds the amount necessary to properly deter and punish Stranger's wrongful conduct. Therefore, we reject Stranger's contention that the award is excessive as a matter of law.

overwhelming weight of the evidence was that defendant Stranger does not have the financial ability to pay punitive damages." This ground for a new trial was not discussed at all at the hearing on Stranger's motion.

## IV.  DISPOSITION

The judgment is affirmed.

 

_____
Haerle, J.


We concur:


_____
Kline, P.J.


_____
Lambden, J.